UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ANGELA CLARK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:13-CV-1082 JD |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## **OPINION AND ORDER**

On October 7, 2013, Plaintiff Angela Clark filed a complaint in this Court, seeking review of the final decision of the Defendant Commissioner of Social Security ("Commissioner"). [DE 1.] The matter is fully briefed and ripe for decision. For the reasons stated below, the Court **REMANDS** this matter to the Commissioner for further proceedings.

### I. Procedural History

Ms. Clark filed an application for disability insurance benefits and supplemental security income in September 2007. (R. 224–29.) Her applications were denied in January 2008 and again on reconsideration in March 2008. (R. 106–07.) A hearing was held before Administrative Law Judge Sherry Thompson on April 1, 2010 (R. 85–105), after which she issued an unfavorable decision. (R. 111–18.) The Appeals Council granted a request for review and remanded Ms. Clark's claim for further evaluation of a medical source statement. (R. 123–25.)

After remand, the case was assigned to Administrative Law Judge Melody Paige. She conducted a hearing on February 22, 2012. (R. 41–84.) On March 9, 2012, ALJ Paige issued a decision, again denying both claims. (R. 29–40.) The Appeals Council denied a request to review

the second decision on August 14, 2013, making the ALJ's decision the final decision of the Commissioner. (R. 7–9.) This suit followed.

## II. Facts

Ms. Clark was born on November 19, 1982, and was 29 years old on the date the ALJ rendered her decision. (R. 224.) Ms. Clark graduated from high school, and began attending college part-time in 2006. (R. 56–57.) Her past employment includes work as a group home worker, a home health care worker, and a part-time receptionist. (R. 66–69.) Ms. Clark alleges a disability onset date of September 10, 2007 (R. 224), and claims disability based on physical impairments.

### A. Medical Evidence

Ms. Clark claims, and the ALJ found, that she suffers from Postural Orthostatic Tachycardia Syndrome ("POTS"), hypertension, and obesity. (R. 31–32.) POTS is a fairly rare condition that is classified as a form of Inappropriate Sinus Tachycardia by the National Institute of Neurological Disorders and Stroke. (R. 15.)[1] POTS is characterized by "a rapid increase in heartbeat of more than 30 beats per minute, or a heart rate that exceeds 120 beats per minute, within 10 minutes of rising." *NINDS Postural Tachycardia Syndrome Information Page*, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/postural_tachycardia_syndrome/postural_tachycardia_syndrome.htm (last visited Feb. 6, 2015).

Medical records of Ms. Clark's physical impairments date to late 2005, though she has reported similar symptoms since childhood. (R. 381; 523–24.) On December 11, 2005, Ms. Clark received an electrocardiography test ("EKG") at Portage Community Hospital. The EKG indicated a minor sinus arrhythmia, with the rest of the EKG within normal limits. (R. 524.)

---

[1] Tachycardia means the "rapid beating of the heart, conventionally applied to rates over 90 beats per minute." *Stedman's Medical Dictionary* 1931 (28th ed. 2006).

On January 27, 2006, Ms. Clark saw Gary Brigham, M.D., a cardiologist at Cardiac Care Associates, for evaluation of tachycardia and recurrent episodes of near syncope.[2] (R. 390). Dr. Brigham's notes from the consultation reference previous Holter monitor and echocardiogram tests, conducted when Ms. Clark was 16 or 17 years old, which showed normal results. (*Id.*) A physical examination revealed a drop in blood pressure from 112/62 to 94/60 when standing. (*Id.*) Ms. Clark underwent 24-hours of monitoring using a Holter monitor, which indicated substantially increased heartbeat during times of normal activity, as well as an increase in heart rate of 40 beats per minute while standing and ambulating. (R. 392.) Dr. Brigham's summary of the monitoring states, in part, "the patient has a tendency towards a sinus tachycardia during minimal activity." (*Id.*) Dr. Brigham ordered an Echo-Doppler Report, which appeared normal. (R. 393.) Ms. Clark also underwent a tilt table test. (R. 470.)

On February 9, 2006, Dr. Brigham conducted a stress test, which was eventually halted because of fatigue. (R. 391.) Ms. Clark achieved a peak heart rate of 167 beats per minute and a total work load of 8.4 mets.[3] Dr. Brigham's summary indicated that Ms. Clark showed "excessive resting tachycardia" and became symptomatic when her heart rate exceeded 160 beats per minute. (*Id.*) Later that month, Ms. Clark was prescribed medication to attempt to regulate her presyncope and tachycardia. (R. 403.) Throughout 2006 and 2007, adjustments were made to prescription dosages and a variety of medications were prescribed. (R. 396–402.)

On March 27, 2007, Ms. Clark was admitted to the emergency department at St. Anthony Medical Center for lightheadedness, elevated blood pressure, shortness of breath, heart

---

[2] Syncope means "loss of consciousness and postural tone caused by diminished cerebral blood flow." *Stedman's Medical Dictionary* 1887 (28th ed. 2006).

[3] "Met" is an abbreviation for metabolic equivalent, which is a measure expressing the energy cost of physical activities. *Stedman's Medical Dictionary* 664 (28th ed. 2006).

palpitations, and irregular heart rate. (R. 460–75.) An EKG was performed and revealed normal sinus rhythm and no evidence of ischemia or dysrhythmia. (R. 471.) Ms. Clark was released with instructions to lower the dosage of her current medication and follow-up with her primary care physician. (*Id.*)

Ms. Clark's condition proved resistant to medication. On November 19, 2007, Dr. Brigham wrote a letter to Indiana Medicaid, in which he indicated that the medications used to affect Ms. Clark's condition had been poorly tolerated or ineffective. (R. 492.) Dr. Brigham confirmed Ms. Clark's diagnosis of POTS and reported that Ms. Clark's recurrent episodes of disabling presyncope had progressed "to the point where she is now unable to effectively work." (*Id.*) Dr. Brigham indicated that Ms. Clark's condition left her with limited functionality and noted that there was no expected date of improvement because Ms. Clark had already been through almost all of the usual medications, without seeing improvement. (*Id.*)

On July 1, 2008, Ms. Clark presented to the emergency room at Saint Anthony Medical Center. (R. 505.) The Emergency Department Note states that Ms. Clark was driving home when her heart started to race and she started to feel lightheaded, shaky, and weak. Ms. Clark believed she was going to pass out. (*Id.*) An ambulance was called and Ms. Clark was taken to the hospital where an EKG was conducted. Ms. Clark's EKG showed a sinus rhythm with a rate of 82 and no ischemic changes. (R. 506.) Ms. Clark was released with a plan to follow up with Dr. Brigham. (*Id.*)

On October 28, 2008, Ms. Clark underwent another stress test performed by Dr. Brigham. (R. 552.) Upon standing on the treadmill, Ms. Clark's heart rate went to 115 beats per minute. (*Id.*) Ms. Clark achieved a peak heart rate of 180 beats per minute "at which point she became very symptomatic and required discontinuation of exercise." (*Id.*) The report states in summary

that Ms. Clark had an "[a]bnormal treadmill study demonstrating a resting sinus tachycardia with a pronounced exacerbation during low level exercise" as well as "severely diminished functional capacity." (*Id.*)

In a Medical Source Statement dated on October 30, 2008, Dr. Brigham opined that Ms. Clark was limited to lifting less than ten pounds even occasionally, as well as less than two hours standing or walking in an eight-hour workday. (R. 500–503.) He opined no limitations on sitting. (R. 501.) Dr. Brigham wrote that Ms. Clark "has severe functional limitations that are exertional in nature. These were documented by treadmill testing. She is unable to lift or carry things for any period of time due to recurrent tachycardia and near syncope." (*Id.*) At some point before July 2009, Dr. Brigham updated the assessment, writing "[b]ased upon her most recent assessment, I believe she is limited to walking < 1 hour." (R. 548.)

On November 1, 2011, Dr. Brigham wrote a letter in support of Ms. Clark's Social Security Disability Appeal. (R. 555.) Dr. Brigham wrote that Ms. Clark's "has had no significant change in overall functional status [since 2008] despite tapering doses of medication and attempts at new medications." (*Id.*) He further wrote: "Her control of her arrhythmias with this medication has been marginal at best. I don't anticipate that this is due to any reversible cause and it continues to significantly limit her and result in recurrent periods of near syncope. Mrs. Clark's arrhythmias have been documented extensively including during ambulatory monitoring as well as during provocative stress testing. I anticipate continuing Mrs. Clark on her current medications and don't expect any significant change in overall functional status over the next several years." (*Id.*)

**B.     Hearing Testimony**

At the 2012 hearing, testimony was heard from Ms. Clark and Vocational Expert ("VE") Lee Knutson; Ms. Clark was represented at the hearing by her attorney, Rick Gikas. (R. 47.)

*1.     Ms. Clark's Testimony*

Ms. Clark testified that she is single and lives by herself in a duplex home. (R. 56.) She has a driver's license and is able to drive. (*Id.*) She graduated from high school and has attended college classes part-time since 2006 at Indiana University Northwest. (R. 56–57.) She takes approximately nine credits per semester and hopes to earn a Bachelors of Fine Arts, focusing in photography. (R. 57.) Following graduation, she hopes to have some kind of job in photography, "taking pictures or working kind of on a freelance." (*Id.*) She attends school two days a week. (R. 58.) Ms. Clark estimated that she had missed five class days in the four-to-five weeks immediately preceding the hearing, as well as eight or nine class days in the prior semester. (R. 70.) The reason for missing the classes was that she was "too dizzy, or lightheaded or my heart is going too fast" and she is not able to get out of bed. (*Id.*) On some days that she attends classes, she lays down in between classes in order to prepare for the next class. (R. 71–72.)

At the time of the hearing, Ms. Clark was not employed. (R. 53.) She stated that she had not been employed since 2007, when her cardiologist suggested that she not work anymore. (*Id.*) Prior to that time, she had worked full-time for a few years, in a variety of positions. (*Id.*) Her previous positions included being a part-time receptionist with a real estate company, working in the office of a home health care company, and working as a direct care professional in a group home with mentally handicapped adults. (R. 67.)

Ms. Clark testified that she has "good days and bad days." (R. 57.) Even on good days, it takes her "a little while to get out of bed" because she has to "get up slow." (R. 58.) She

explained that if she gets up quickly, her "blood pressure can drop, [and] heart rate can race or go [too] low." (*Id.*) She testified that "it's quite a process just to get up and get ready." (*Id.*) On school days, she has an hour-and-a-half break to relax between classes. On bad days, she said "there's not much activity at all. It's either I'm in bed or I'm laying on the couch. There's not, there's not much I do at all if it's a bad day." (*Id.*) When questioned by counsel, Ms. Clark estimated that she has three "bad days" in a typical week. (R. 69.)

Ms. Clark explained that she does not always take her medicine because she builds up a tolerance to the medicine. (R. 62.) To combat this, she starts on lower doses, which she increases over time. When the dosage is maxed out, she has "to go off the medicine and be off of it for at least three months" before she can begin taking it again. (R. 62–63.) When she does take the medication, it decreases Mr. Clark's symptoms. (R. 64.)

Ms. Clark considers Dr. Brigham to be her treating physician and sees him approximately every six months. (R. 65.) The last time she had seen him before the hearing was approximately one month earlier. (*Id.*)

Ms. Clark summarized her experience when she has an "episode" of heart racing. (R. 72.) When she has an episode, she focuses on relaxing and trying to "regain some kind of control over what's going on." (*Id.*) The episodes last anywhere from 30 seconds to 15 minutes, with an average time of about 5 minutes; she has such episodes at least ten times per day. (*Id.*)

2. *Vocational Expert's Testimony*

VE Knutson characterized Ms. Clark's past work as: secretary, home health aide, and group home worker. (R. 78.) The work ranged from skilled to semi-skilled and was performed at exertional levels from medium to heavy. (*Id.*)

The ALJ asked the VE a series of hypotheticals regarding an individual with Ms. Clark's age, education, vocational background, and the following abilities/limitations: can perform light exertional work; occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk six hours in an eight-hour work day; sit for six hours in an eight-hour work day; would be able to frequently climb ramps, stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds; and would need to avoid even moderate exposure to hazards, such as machinery and heights. (*Id.*) The VE stated that such an individual could perform Ms. Clark's prior work as a secretary or group home worker. (R. 79.)

Next, the ALJ added an additional limitation to the hypothetical, namely that instead of being able to perform light work, the person was limited to sedentary work. (*Id.*) The VE stated that such an individual could perform Ms. Clark's prior work as a secretary, as well as certain other sedentary jobs that existed in the economy. (R. 79–80.)

The ALJ then added additional limitations: that the person could not lift or carry more than ten pounds; standing and/or walking was limited to less than two hours in an eight-hour work day; and the person could never climb ramps, stairs, ladders, ropes, or scaffolds, and could never balance; could occasionally kneel, crouch, stoop, reach in all directions; and that the person needs to avoid exposure to temperature extremes, dust, humidity, wetness, hazards such as machinery or heights, fumes, chemicals, and gasses. (R. 80–81.) The ALJ clarified that sitting would be unlimited. (R. 81.) The VE testified that certain sedentary jobs exist in the national economy that such a person could perform. (R. 81–82.) The VE testified that missing four unscheduled work days per month would preclude a person from sustaining competitive employment. (R. 82.)

Ms. Clark's counsel questioned the VE. (R. 82–84.) The VE testified that being off task for 20 percent of the work day would cause a person to lose his or her job. (R. 82.) Additionally, the VE clarified that limiting the person in the ALJ's final hypothetical to one hour of standing would not affect the VE's opinion regarding employability. (R. 83.)

**C.   ALJ's Decision**

On March 9, 2012, the ALJ rendered her decision, ultimately finding that Ms. Clark is not disabled. (R. 29–40.) At step two, she found that Ms. Clark suffered from the following severe impairments: POTS, hypertension, and obesity. (R. 31.) The ALJ also discussed Ms. Clark's mental condition,[4] but found any limitations to be non-severe because they did not cause more than a minimal limitation in her ability to perform basic mental work activities. (R. 32.)

At step three, the ALJ determined that Ms. Clark did not have an impairment or combination of impairments that met or medically equaled any listed impairments. (R. 32–33.) The ALJ found that, although Ms. Clark's counsel argued that she met Listing 4.05, the evidence did not support a finding of recurrent episodes of cardiac syncope or near syncope. (R. 33.) She further noted that those episodes of near syncope that were self-reported by Ms. Clark did not meet the Listing definition. (R. 33.)

The ALJ then articulated the following residual functional capacity ("RFC") determination:

---

[4] Ms. Clark did not argue before the ALJ, and does not argue in this Court, that she suffers any impairment from a mental condition. However, the state agency recommended a mental status examination and Ms. Clark was evaluated by Patrick McKian, Ph.D. (R. 411–13.) During the examination, Dr. McKian noted that Ms. Clark "appeared to have a very good attitude about her situation in spite of feeling concerned about her medical future" and that she "admits to some times [sic] getting frustrated but denied feeling particular[ly] depressed." (R. 412.) Dr. McKian stated his diagnostic impression that Ms. Clark suffered from "Adjustment Reaction with mixed emotional features secondary to her medical problems and the impact that it has had on her life." (R. 413.) Because Ms. Clark does not contend that the ALJ erred in assessing this mental condition and its effects, it does not require any further discussion in this opinion.

9

> [Ms. Clark] has the residual functional capacity to lift and carry less than ten pounds and stand and/or walk for less than two hours of an eight-hour workday with no sitting limitation. [Ms. Clark] should never climb ramps, stairs, ladders, ropes, or scaffolds and should never balance; however, she can occasionally kneel, crouch and stoop, and reach in all directions including overhead. [Ms. Clark] must avoid concentrated exposure to temperature extremes, dust, humidity, wetness, hazards such as heights and machines, fumes, chemicals, and gases.

(R. 33.) In a footnote to the RFC, the ALJ noted that she alternatively considered a situation in which Ms. Clark would be limited to one hour of standing and/or walking, but that even with such a limitation Ms. Clark would not be disabled. (R. 33 n.2.) In making the determination of Ms. Clark's RFC, the ALJ conducted a credibility analysis. (R. 34–38.)

The ALJ found that Ms. Clark's allegations concerning the intensity, persistence, and limiting effects of her symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 34.) While finding that the "record does reflect that [Ms. Clark] is limited," the ALJ found those limitations to be non-disabling. (R. 36.) Specifically, the ALJ articulated three reasons to discredit Ms. Clark's allegations: "The claimant has sought routine treatment, is able to perform most activities of daily living, and is currently in school studying for a light/medium exertional profession." (*Id.*) Additionally, the ALJ wrote: "With respect [to] the claimant's allegations of falling asleep, inability to focus, and headaches, the undersigned finds these allegations not credible. There is no significant evidence of these symptoms contained in the record. Furthermore, the claimant is able to successfully attend college classes. Finally the claimant did not testify to these symptoms at the hearing, which indicates that they are not severe (or non-existant)." (*Id.*)

At step four, the ALJ determined that Ms. Clark was unable to perform her past work because the jobs exceeded the limitations set forth in the RFC. (R. 38.) At step five, the ALJ

concluded that Ms. Clark was not disabled because jobs existed in the national economy that Ms. Clark could perform despite the limitations in the RFC. (R. 38–39.) As a result, the ALJ concluded that Ms. Clark was not disabled within the meaning of the Social Security Act since the alleged onset date.

### III. Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary

support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### IV. Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following order:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. Whether the claimant has a medically severe impairment;
>
> 3. Whether the claimant's impairment meets or equals one listed in the regulations;
>
> 4. Whether the claimant can still perform relevant past work; and
>
> 5. Whether the claimant can perform other work in the community.

12

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's residual functional capacity, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Ms. Clark challenges the ALJ's decision on three grounds. First, she argues that the ALJ erred in finding that Ms. Clark did not meet Listing 4.05 and that—at the very least—the ALJ should have sought a medical opinion as to whether Ms. Clark's condition equaled Listing 4.05. [DE 14 at 7–10.] Second, she argues that the ALJ's credibility determination of Ms. Clark's testimony regarding her symptoms was flawed. [DE 14 at 10–22.] Finally, she argues that the hypothetical posed to the vocational expert failed to account for various aspects of Ms. Clark's impairments. [DE 14 at 22–23.]

The Court begins with the second argument—regarding the credibility determination— and finds the ALJ's credibility determination with respect to Ms. Clark's ability to stay on-task in light of her POTS symptoms was patently wrong. Because this error affected Ms. Clark's RFC and the hypothetical posed to the VE, the error requires remand for further consideration.

13

### A. Ms. Clark's Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms and how her symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). While subjective allegations of disabling symptoms alone cannot support a finding of disability, *id.*, the ALJ must consider the claimant's subjective complaints, the relevant objective medical evidence, and other factors relevant to a claimant's symptoms including:

> (1) The individual's daily activities;
> (2) Location, duration, frequency, and intensity of pain or other symptoms;
> (3) Precipitating and aggravating factors;
> (4) Type, dosage, effectiveness, and side effects of any medication;
> (5) Treatment, other than medication, for relief of pain or other symptoms;
> (6) Other measures taken to relieve pain or other symptoms;
> (7) Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

An ALJ is not required to give full credit to every claim made by the claimant or to find a disability each time a claimant states she is unable to work. *Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, SSR 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p. Because the ALJ is "in the best position to determine a witness's truthfulness and forthrightness . . . [the] court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310–11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504–05 (7th Cir. 2004)).

Ms. Clark claims that the ALJ improperly discounted her statements regarding the limiting effects of her symptoms, including the significant amount of time she would need to spend off-task in order to regulate her symptoms. This Court agrees.

Ms. Clark spent a significant amount of her testimony at the second hearing discussing the effects that POTS episodes have on her ability to function. Ms. Clark testified of the need to lay down when such episodes occur. (R. 71.) Moreover, she testified that she is not able to focus during the duration of an episode, but rather has to undergo a "meditation process, where it's focusing on breathing, it's focusing on relaxing, trying to, to regain some kind of control over what's going on." (R. 72.) She testified that such activities were not always successful. (*Id.*) Additionally, the evidence before the ALJ was that such efforts were only used to reduce the duration of an already-in-progress episode, rather than stopping them from occurring in the first place.

Even in the face of this evidence, the RFC does not account for any potential interruption in pace or attention, or any potential need for more frequent breaks in order to address POTS symptoms. In order for this RFC to be consistent with the evidence in the record, the ALJ would have needed to find Ms. Clark's testimony almost entirely incredible.

However, the ALJ doesn't expressly make any credibility finding on the issue of how often or how long Ms. Clark would be interrupted during the work day by episodes related to her POTS. The ALJ does say that Ms. Clark "is able to perform most activities of daily activity, and is currently in school studying for a light/medium exertional profession." (R. 36.) She also states "[w]ith respect to the claimant's allegation of falling asleep [and] inability to focus" the allegations are not credible because "[t]here is no significant evidence of these symptoms

15

contained in the record," "the claimant is able to successfully attend college classes," and "the claimant did not testify to these symptoms at the hearing." (*Id.*).

The last point is wrong; Ms. Clark did testify about the effects on her focus that she suffers while undergoing an episode of increased heart rate, attributable to her POTS. (R. 72–73.) And whether there is significant evidence in the record is non-dispositive. SSR 96-7p (claims of limitation "may not be disregarded solely because they are not substantiated by objective evidence.").

That leaves her daily activities, which included attending college part-time. With respect to attending college classes, the ALJ's analysis is only that Ms. Clark can do so "successfully." (R. 36.) At hearing, Ms. Clark testified to the numerous self-accommodations she makes in order to do so, including resting for as long as an hour-and-a-half between classes, and skipping her last class on days she is "not feeling well enough to go." (R. 58, 65, 72). The ALJ makes no reference to these self-accommodating activities or how they impact the credibility of Ms. Clark's claimed limitations. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (ALJ may not ignore an entire line of evidence that is contrary to her findings). By focusing only on the evidence that supports the RFC while glossing over Ms. Clark's other limitations, the ALJ engaged in inappropriate "cherry-picking." *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding).

Further, whether Ms. Clark's college activities can be considered fully "successful" is not clear. Ms. Clark testified that she had already missed five classes during the semester in which the hearing was held—which was only four or five weeks old at the time. (R. 70.) The previous

semester she had missed at least eight class days. (*Id.*) These absences caused her to nearly fail a class; she was spared that fate when the instructor gave her a break because they had "made special arrangements" at the beginning of the semester. (*Id.*) The ALJ does not consider the extent that an employer would be willing to make similar arrangements in the face of repeated absences. *See Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter . . . and is not held to a minimum standard of performance, as she would be by an employer."). And, of course, Ms. Clark's desire to someday perform photography work—the duration and intensity of which Ms. Clark testified would be sporadic (R. 73)—is not the same as being currently capable of sustaining full-time employment.

Moreover, Ms. Clark testified that she has "good days and bad days." (R. 57.) The ALJ's cursory analysis only covers the good. On bad days, Ms. Clark explained that her POTS symptoms rendered her unable to do more than stay in bed or on the couch, (R. 57–58), and she estimated that she has three bad days per week, (R. 69). The ALJ did not address whether she found this claim credible. In doing so, she ran afoul of the rule that "an ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993) (per curiam) (alteration in original) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

On the whole, the ALJ's failure to analyze the main limiting feature of Ms. Clark's condition was so deficient that the Court cannot find a "logical bridge" between the evidence and her conclusions. *Terry*, 580 F.3d at 475. Here, that failure affected the RFC findings regarding

the extent of Ms. Clark's limitations, and thus the analysis at steps four and five.[5] Accordingly, the Court will remand to the Commissioner for further proceedings consistent with this opinion.

**B.     Medical Equivalence**

Ms. Clark argues, as she did before the ALJ, that her condition met or equaled Listing 4.05. That Listing provides that benefits are available to claimants with the following condition: "Recurrent arrhythmias, not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled, recurrent episodes of cardiac syncope or near syncope, despite prescribed treatment, and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope." The ALJ rejected that argument. However, the ALJ cites as her only sources documents that are silent on the matter of medical equivalence. (R. 33.) Further, the Commissioner cites—and the Court can find—no medical opinion in the record touching on the question of medical equivalence.

To make a determination regarding equivalence, an expert would need to be consulted. S.S.R. 96–6p at 3 ("[L]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."), reinstating S.S.R. 83–19; *see Farrell v.*

---

[5] Admittedly, the Seventh Circuit has occasionally concluded that a VE has familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations and the VE considered that evidence when indicating the type of work the claimant is capable of performing. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819–21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)). This exception does not apply here, since the VE never indicated having reviewed Ms. Clark's medical records, nor did he indicate in his responses having relied on those records or the hearing testimony. Rather, the VE's attention was on the limitations of the hypothetical person posed by the ALJ, rather than on the record itself or the limitations of the claimant herself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).

18

*Sullivan*, 878 F.2d 985, 990 (7th Cir.1989) (concluding that ALJ complied with requirement of S.S.R. 83–19 that he consider a consulting physician's opinion regarding medical equivalency).

It is error to fail to consider an expert opinion on the question of whether the medical evidence supports a finding of equivalency. *See Minnick v. Colvin*, No. 13-3626, 2015 WL 75273, at *5–6 (7th Cir. Jan. 7, 2015) (remanding where, among other things, "the ALJ never sought an expert's opinion as to whether any of the evidence could support a finding of equivalency"); *Barnett v. Barnhart*, 381 F.3d 664, 670–71 (7th Cir. 2004) ("Here, the ALJ did not consult an expert regarding medical equivalence. . . . Nor can we locate [any evidence] that would otherwise satisfy the ALJ's duty to consider an expert's opinion on medical equivalence. Yet, rather than soliciting a neurologist's opinion on the matter, the ALJ simply assumed the absence of equivalency without any relevant discussion. That assumption cannot substitute for evidence and does not support the decision to deny benefits."). For this additional reason, remand is required.

**C.    Ms. Clark's Request for a Direct Award of Benefits**

In her reply brief, Ms. Clark requests that the Court "direct that on remand, a finding of disabled should be entered." [DE 21 at 1.] Her rationale for the request is that "Ms. Clark's claim has been pending before the Administration since 2007, and the evidence of record shows that she cannot sustain full time employment." [*Id.*] Additionally, she notes that the claim "has now been through the administrative process twice with two ALJ's failing to give serious consideration to Dr. Brigham's opinions or functional limitations." [*Id.* at 12.] The Court is sympathetic to Ms. Clark's situation, but in light of the credibility issues that remain to be decided before any benefits may be awarded, remand without any instruction regarding the eventual disposition is the appropriate remedy in this case.

## V. Conclusion

For the reasons stated above, the Court **GRANTS** Ms. Clark's request to remand the ALJ's decision, but **DENIES** her request that the Court direct an award of benefits on remand. The Commissioner's decision is **REMANDED** for further proceedings consistent with this opinion.

SO ORDERED.

ENTERED:  February 11, 2015

/s/ JON E. DEGUILIO<br>Judge<br>United States District Court